UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

      :

UNITED STATES OF AMERICA

      :

     -v.-            :     **INDICTMENT**

      :

PHILIP WONG,           07 Cr. ___

      :

           Defendant.

      :

- - - - - - - - - - - - - - - - - -x

**07 CRIM 1148**

**COUNT ONE**

(Conspiracy to Commit Securities Fraud)

The Grand Jury charges:

**Relevant Entities and Individuals**

1.    From in or about February 2006 through in or about May 2006, TotalMed, Inc. ("TotalMed") was a Delaware corporation, with headquarters in Manchester, Connecticut. TotalMed's common stock was publicly traded on the Over-the-Counter Bulletin Board market ("OTC-BB"), an electronic, screen-based market for securities.  TotalMed's common stock traded under the symbol "TTMD".

2.    At all times relevant to this Indictment, eNotes Systems, Inc. ("eNotes") was a Florida corporation, with headquarters in Los Angeles, California, that provided electronic medical records software to physicians and clinics, and other services.  On or about April 28, 2006, TotalMed entered into a stock purchase agreement with eNotes, and purchased all of eNotes's common stock.  Subsequently, TotalMed changed its name to eNotes.  Thereafter, eNotes' stock was publicly traded on the

OTC-BB under the symbol "ENSY."  On or about November 6, 2006, eNotes changed its name to Veridigm, Inc. ("Veridigm"). Veridigm's common stock was publicly traded on the OTC-BB under the symbol "VRDG".

3.    At all times relevant to this Indictment, PHILIP WONG, the defendant, was a stock promoter.

## Overview Of The Securities Fraud Scheme

4.    From in or about February 2006 through in or about October 2006, PHILIP WONG, the defendant, and others known and unknown, schemed to defraud investors in eNotes stock by paying secret bribes to purported financial advisors to cause their purported associates or customers to purchase eNotes's stock.  At times, these purchases permitted WONG and his co-conspirators to generate cash by selling their own eNotes stock holdings.

5.    In furtherance of the scheme, WONG had numerous, separate discussions with two confidential informants ("CI-1" and "CI-2") working at the direction of the Federal Bureau of Investigation (the "FBI"), who purported to know investors who would purchase eNotes stock, in return for secret, undisclosed kickbacks that WONG and his co-conspirators would pay to CI-1 and CI-2.

6.    According to the plan, when CI-1 and CI-2 convinced their purported associates and "clients" to purchase eNotes stock, WONG and his co-conspirators would in turn pay CI-1

and CI-2 a percentage of the proceeds of such sales.  It was understood between WONG and CI-I and CI-2 that these payments would not be disclosed to the associates or "clients."  In addition, CI-1 and CI-2 represented that the purchasers would hold the stock, and would not sell it for a substantial period of time.

### The Private Placement

7.    From in or about February 2006 through in or about March 2006, CI-1 spoke with WONG in numerous recorded phone conversations about arranging private placement purchases of eNotes stock in exchange for undisclosed cash and stock kickbacks.  According to the plan, CI-1 would convince one or more of his purported business associates to purchase stock through a private placement transaction.  After the associate purchased eNotes stock, WONG would pay CI-1 approximately 10 percent of the proceeds of such sales plus shares of eNotes stock.

8.    In furtherance of this scheme, on or about February 14, 2006, WONG spoke with CI-1 in a recorded conversation.  WONG and CI-1 discussed a private placement transaction in which CI-1's business associates would purchase a block of stock worth between approximately $200,000 and $250,000.

9.    On or about March 21, 2006, in a recorded conversation, WONG told CI-1 that they were considering a $300,000 private placement transaction involving CI-1's

3

associates.  WONG informed CI-1 that he had discussed with his partners paying CI-1 a package of cash and stock.

10.  On or about March 27, 2006, in a recorded conversation, in an effort to hide the true nature of the kickback payment, WONG suggested that CI-1 could be paid through a management or consulting contract, which would pay CI-1 a combination of cash and stock.  The following day, in an e-mail to CI-1, WONG proposed the purchase of 1 million shares of eNotes stock at a price of $.35 per share, for a total cost of $350,000. In return, CI-1 would receive a management contract for $35,000 plus 50,000 shares of eNotes stock.

11.  On or about April 17, 2006, two checks in the amount of $50,000 each, drawn on undercover bank accounts, were mailed to a Jersey City, New Jersey law firm (the "New Jersey Law Firm"), to purchase a total of 285,714 shares of TotalMed stock at a price of $.35 per share, for a total price of $100,000.

12.  Subsequently, pursuant to the scheme, on or about June 7, 2006, approximately $10,000 was wire transferred to an undercover FBI bank account.  This payment constituted a kickback of approximately 10 percent of the approximately $100,000 worth of eNotes/TotalMed stock purchased on or about April 17, 2006, by CI-1's purported associates.

13.  On or about July 13, 2006, CI-1 received via express mail from a stock transfer agent two stock certificates for eNotes stock, each in the amount of 142,857 shares.

4

14.   Later, pursuant to the scheme, on or about October 6, 2006, CI-1 received via express mail a stock certificate for 17,150 shares of eNotes, as further payment for the $100,000 investment made by CI-1's two purported associates.

The Purchases Of eNotes Stock On The OTC-BB Market

15.   From in or about August 2006 through in or about September 2006, WONG spoke with CI-2 in numerous recorded phone conversations about arranging purchases of eNotes stock in exchange for undisclosed cash kickbacks.  According to the plan, CI-2 would convince one or more "clients" to purchase eNotes stock.  When the "client" was ready to purchase eNotes stock, CI-2 would alert WONG, and WONG and his co-conspirators would fill the "client's" stock order using sales of eNotes shares from accounts controlled by WONG and his co-conspirators.  WONG, in turn, would pay CI-2 approximately 20 percent of the proceeds of such sales.

16.   In furtherance of this scheme, on or about August 7, 2006, WONG spoke with CI-2 in a recorded conversation.  WONG and CI-2 discussed doing business together, and how they could direct stock trades to achieve the objective of the scheme.  WONG informed CI-2 that he was currently working on ENSY (the stock ticker symbol for eNotes at the time).  CI-2 expressed a desire to be paid commissions of approximately 20 percent.

17.   Pursuant to the scheme, on or about August 9, 2006, in a recorded phone call, WONG informed CI-2 that he was

ready and willing to conduct transactions pursuant to the scheme. WONG and CI-2 discussed using a particular brokerage firm for the stock trades to make sure that WONG could identify the trades so that the purchase orders could be filled using stock that WONG controlled. WONG and CI-2 also agreed that CI-2 would receive a payment of 20 percent of the value of the stock purchased by the "client." CI-2 emphasized to WONG they need to make sure that CI-2's "clients don't know that I'm getting anything on this" on the side. WONG agreed that would not be a problem.

18. On or about August 23, 2006, in a recorded call, CI-2 told WONG that he would be ready to go forward the following morning when the stock market opened. CI-2 stated that his "client" would purchase approximately $30,000 worth of stock through a New York brokerage firm (the "Brokerage Firm"). CI-2 also provided WONG with the account name, account number, and bank address in New York, New York, for an undercover bank account utilized by the FBI (the "Undercover Bank Account"), in order for WONG to make the kickback payment to CI-2. WONG informed CI-2 that the "turn around time" for CI-2 to receive the wire payment would probably be three to four days.

19. On or about August 24, 2006, using an undercover brokerage account at the Brokerage Firm, in New York, New York, that was purported to be controlled by a "client" of CI-2, the FBI purchased approximately 100,000 shares of eNotes stock at a price of approximately $0.2893 per share, for a total cost of

6

approximately $28,930, not including commissions and fees.

20. That same day, on or about August 24, 2006, in a recorded phone call, WONG told CI-2 that they had "caught" the stock purchase at a price of 28 15/16. WONG stated that they would get a wire out to CI-2.

21. Subsequently, pursuant to the scheme, on or about August 25, 2006, approximately $5,785 was wire transferred to the Undercover Bank Account from an account in the name of a family member of one of WONG's co-conspirators. This payment constituted a kickback of approximately 20 percent of the approximately $28,930 worth of eNotes stock purchased the previous day by CI-2's purported "client."

22. On or about September 12, 2006, in a recorded phone call, WONG, who was in New York, New York, spoke to CI-2. CI-2 told WONG that "his guy" was ready to make a $40,000 purchase of stock the next day. WONG replied, "Okay, let me talk to the guys tonight," and arranged to speak again with CI-2 the following morning. WONG and CI-2 agreed that CI-2 would be paid a 20 percent kickback for the stock purchase.

23. On or about September 13, 2006, in recorded phone calls, WONG and CI-2 agreed that CI-2 would arrange a trade to purchase 120,000 shares of eNotes stock at a price of $.34 per share. That same day, using an undercover brokerage account at the Brokerage Firm in New York, New York, that was purported to be controlled by a "client" of CI-2, the FBI purchased

approximately 120,000 shares of eNotes stock at a price of approximately $0.34 per share, for a total cost of approximately $40,800, not including commissions and fees.

24.   Subsequently, pursuant to the scheme, on or about September 20, 2006, approximately $7,800 was wire transferred to the Undercover Bank Account from an account in the name of a corporation located in Nassau, Bahamas.  This payment constituted a kickback of approximately 20 percent of the approximately $40,800 worth of eNotes stock purchased on or about September 13, 2006, by CI-2's purported "client."

## STATUTORY ALLEGATIONS

### The Conspiracy

25.   From in or about February 2006 through in or about October 2006, in the Southern District of New York and elsewhere, PHILIP WONG, the defendant, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, to commit fraud in connection with the purchase and sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

26.   It was a part and an object of the conspiracy that PHILIP WONG, the defendant, together with others known and unknown, unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce, the mails,

8

and the facilities of national securities exchanges, directly and indirectly, would and did use and employ, in connection with the purchase and sale of eNotes common stock, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

## Means and Methods of the Conspiracy

27.   Among the means and methods by which PHILIP WONG, the defendant, and his co-conspirators, would and did carry out the conspiracy were the following:

a.   WONG agreed to pay secret bribes to purported financial advisors in order to induce them to cause their purported associates and "clients" to purchase and hold eNotes stock.

b.   WONG used interstate wires and the facilities of interstate and foreign commerce in furtherance of the object of the conspiracy.

**Overt Acts**

28.   In furtherance of the conspiracy and to effect its unlawful object, PHILIP WONG, the defendant, together with others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   On or about February 14, 2006, in a recorded telephone call, WONG stated to CI-1 that he would be interested in doing a private placement transaction, and they could start with a block of stock worth approximately $200,000 to $250,000.

b.   On or about March 13, 2006, in a recorded telephone call, WONG told CI-1 that they could sell 1,000,000 shares at $0.30 per share, for $300,000, and that he could pay CI-1 with a combination of cash and stock.

c.   On or about March 21, 2006, in a recorded telephone call, WONG told CI-1 that he was interested in doing a $300,000 private placement transaction with CI-1's associates, and that he can "pad" a cash payment with a payment of stock.

d.   On or about March 27, 2006, in a recorded telephone call, WONG informed CI-1 that he was interested in doing a private transaction with CI-1's associates, and that CI-1 could be paid through a management or consulting contract, with a combination of cash and stock.

e.   On or about March 28, 2006, in an email to CI-1, WONG proposed a purchase of 1,000,000 shares of stock at a price of $.35 per share, for a total cost of $350,000, and that

in return, CI-1 would receive a management contract for $35,000 plus 50,000 shares of stock.

f.    On or about May 5, 2006, CI-1 met with WONG and WONG's partner at a coffee shop located on 57th Street, in Manhattan, and they provided CI-1 with a Business Plan for eNotes dated May 2006.

g.    On or about June 7, 2006, WONG and his co-conspirators caused a $10,000 payment to be wired to CI-1 at an FBI undercover bank account, in payment of a bribe for the purchase of two blocks of 142,857 shares of TotalMed/eNotes stock in a private placement transaction.

h.    On or about August 7, 2006, in a recorded telephone call, WONG discussed the scheme with CI-2, how they could direct stock trades in furtherance of the scheme, and that WONG was currently working on ENSY.

i.    On or about August 9, 2006, in a recorded telephone call, WONG agreed that CI-2 would receive a payment of 20 percent of the value of the stock purchased by CI-2's "client," and also agreed that CI-2's "clients" would not learn that CI-2 was getting paid.

j.    On or about August 23, 2006, in a recorded telephone call, WONG took from CI-2 an account name, account number, and bank address in New York, New York, for a bank account, in order for WONG to make a kickback payment to CI-2, and WONG informed CI-2 that the "turn around time" for CI-2 to

11

receive the wire payment would probably be three to four days.

k.    On or about August 24, 2006, after the FBI purchased approximately 100,000 shares of eNotes stock in an undercover account, WONG told CI-2 in a recorded telephone call that they had "caught" the stock purchase, and that they would get a wire payment out to CI-2.

l.    On or about August 25, 2006, approximately $5,785 was wire transferred to an undercover FBI bank account from an account in the name of a family member of one of WONG's co-conspirators.

m.    On or about September 12, 2006, in a recorded telephone call, WONG, who was in New York, New York, agreed to pay CI-2 a 20 percent kickback for a stock purchase planned for the next day.

n.    On or about September 20, 2006, following the purchase of approximately 120,000 shares of eNotes stock in an undercover FBI brokerage account for a total cost of approximately $40,800, not including commissions and fees, WONG caused approximately $7,800 to be wire transferred to an undercover FBI bank account from an account in the name of a corporation located in Nassau, Bahamas.

        (Title 18, United States Code, Section 371.)

## COUNT TWO

(Securities Fraud)

The Grand Jury further charges:

29.    The allegations set forth in paragraphs 1 through 24, and 27 through 28 of this Indictment are repeated and realleged as if set forth fully herein.

30.    From in or about February 2006 through in or about October 2006, in the Southern District of New York and elsewhere, PHILIP WONG, the defendant, together with others known and unknown, unlawfully, wilfully, and knowingly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other

persons in connection with purchases and sales of eNotes' common stock.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
Title 18 United States Code, Section 2.)

## FORFEITURE ALLEGATION

31.  As a result of committing one or more of the foregoing securities fraud offenses, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Section 371; and Title 17, Code of Federal Regulations, Section 240.10b-5, as alleged in Counts One and Two of this Indictment, PHILIP WONG, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the securities fraud offenses.

## Substitute Assets Provision

32.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(i)     cannot be located upon the exercise of due diligence;

(ii)    has been transferred or sold to, or deposited with, a third party;

(iii)   has been placed beyond the jurisdiction of the court;

14

(iv)    has been substantially diminished in value;
or

(v)    has been commingled with other property which
cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p), to seek forfeiture of any

other property of said defendant up to the value of the

forfeitable property described above.

(Title 15, United States Code, Sections 78j(b), 78ff;
Title 18, United States Code, Sections 371 and 981;
Title 21, United States Code, Section 853(p);
Title 28, United States Code, Section 2461;
and Title 17, Code of Federal Regulations,
Sections 240.10b-5 and 240.10b5-2.)

_____
Foreperson

_____
MICHAEL J. GARCIA  WFJ
United States Attorney

15

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA,**

**- v. -**

**PHILIP WONG,**

**Defendant.**

### INDICTMENT

07 Cr. ___

(18 U.S.C. § 371; 15 U.S.C. §§ 78j(b)
& 78ff; 17 C.F.R. § 240.10b-5; and
18 U.S.C. § 2)

MICHAEL J. GARCIA
United States Attorney.

**A TRUE BILL**

Foreperson.